**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**


JOHNNY MACK MITCHELL,

        Plaintiff,

v.                                      Case No.  3:17-cv-609-J-34JRK

PILGRIM'S PRIDE CORPORATION,

        Defendant.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant, Pilgrim's Pride Corporation's (Pilgrim's Pride) Motion for Summary Judgment and Memorandum of Law (Doc. 45; Motion), filed December 13, 2018.  Plaintiff, Johnny Mack Mitchell filed a Response in Opposition to Defendant's Motion for Summary Judgment on January 2, 2019  (Doc. 50; Response).  With leave of the Court, Pilgrim's Pride filed a Reply in Support of Motion for Summary Judgment (Doc. 56; Reply), on March 6, 2019.  Accordingly this matter is ripe for review.

In this action, Mitchell asserts that Pilgrim's Pride has violated his rights under Title VII of the Civil Rights Act, 42 U.S.C. § 2000, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2612, 2624, and Chapter 760 of the Florida Statutes.  See Amended Complaint (Doc. 16), filed July 14, 2017.  Specifically, in his Amended Complaint, Mitchell contends that while he was recovering from a work injury, his employer, Pilgrim's Pride, discriminated against him on the basis of his race and disability, and violated his rights under the FMLA.  See

generally <u>id.</u>  After the close of discovery, Pilgrim's Pride filed the Motion which is fully briefed and both parties submitted record evidence in support of their respective positions.[1]

## I.      Background[2]

Mitchell sues Pilgrim's Pride for race and disability discrimination, as well as for FMLA violations, based on alleged adverse employment actions Pilgrim's Pride took against Mitchell during and after his recoveries from a workplace injury.

### A. Pilgrim's Pride

Mitchell started working for Pilgrim's Pride's predecessor, Gold Kist, in 1991, at its Live Oak, Florida, location.  Lagos Declaration at 3.  Pilgrim's Pride, a chicken processing company, acquired the Live Oak plant in 2008.  <u>Id.</u>  The company takes workplace safety seriously, <u>id.</u> at 3, and emphasizes to all employees that "'[w]orking safely is a condition of employment,' and that '[m]anagement is responsible for maintaining and enforcing safe work practices.'"  <u>Id.</u>  The company also

> has an "open door" policy in which employees are welcome to bring their concerns to management directly, as well as a "PRIDE Line," which is a confidential toll-free hotline that is available 24 hours a day, 7 days a week to allow employees, suppliers, customers and other interested parties to report complaints or concerns.

<u>Id.</u>

---

[1] In support of its Motion, Pilgrim's Pride attached a variety of documents.  Those documents include Doc. 45-2 (Lagos Declaration); Doc. 45-3 (Mitchell Deposition); Doc. 45-4 (Mitchell Deposition, Human Resources Attach.); Doc. 45-5 (Mitchell Deposition, Medical Records); Doc. 45-6 (Mitchell Deposition Attach.); Doc. 45-7 (Burnham Deposition); Doc. 45-8 (Papoi Deposition); Doc. 45-9 (Johnson Deposition); Doc. 45-10 (Riley Deposition); Doc. 45-11 (Glover Deposition).  In support of his Response, Mitchell attached an affidavit.  <u>See</u> Doc. 49-1 (Mitchell Affidavit).  In citing to documents submitted by the parties, the Court will use the page numbers assigned by the Court's CM/ECF page docketing system.

[2] The facts recited in this section are either undisputed, or any disagreement has been indicated.  Because this case is before the Court on Pilgrim's Pride's Motion, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to Mitchell.  <u>See</u> <u>T-Mobile S. LLC v. City of Jacksonville, Fla.</u>, 564 F.Supp.2d 1337, 1340 (M.D. Fla. 2008).

Pilgrim's Pride has standards of conduct applicable to all employees which state that "'[f]ailure to follow instructions or perform designated work' is grounds for 'corrective action, up to and including termination.'" Id. While the company has a progressive discipline policy, an employee can be terminated immediately, "depending on the case." Johnson Deposition at 14, 16. In this regard, the Employee Handbook states that "certain forms or instances of misconduct, rule violations, insubordination and other activities can result in disciplinary action of . . . suspension and or discharge for one offense." Mitchell Deposition, Human Resources Attach. at 20; see also Johnson Deposition at 15.

When Pilgrim's Pride acquired the Live Oak plant, Mitchell was working "as a Live Hanger in the Live Shed Department, where he reported to Supervisor Kenneth Burnham and Superintendent James Johnson." Lagos Declaration at 3; Mitchell Deposition at 29. Mitchell's work required him to take live chickens weighing between three and seven pounds, shackle them, and then hang them on a moving line that would eventually take the chickens to their death and subsequent processing. Mitchell Deposition at 21-24, 30; Papoi Deposition at 34. During the time Mitchell worked in the Live Shed, the company expected Mitchell and his co-workers to hang twenty-eight birds a minute. Mitchell Deposition at 30-31.[3]

### B. Mitchell's shoulder injury, surgery, and recovery

As a result of his work in the Live Shed, Mitchell experienced pain in his shoulders and arms. On February 20, 2013, Mitchell first reported to the Pilgrim's Pride medical department that he was suffering from shoulder and arm pain. Lagos Declaration at 4; Mitchell Affidavit at ¶ 4; Mitchell Deposition at 57; Mitchell Deposition, Medical Records

---

[3] Pilgrim's Pride has since lowered the rate at which employees are expected to live hang birds. Mitchell Affidavit at ¶ 2; Mitchell Deposition at 30-31.

at 6. The pain initially began in his right shoulder, but over time, his left shoulder "worsened substantially." Mitchell Affidavit at ¶ 4.

In June of 2013, Mitchell "applied for worker's compensation for 'bilateral shoulder pain.'" Lagos Declaration at 4; Mitchell Affidavit at ¶ 5; Mitchell Deposition, Medical Records at 16. Mitchell's doctor diagnosed him with "bilateral rotator cuff tendinopathy, impingement signs, mild a.c. joint arthritis bilaterally, and repetitive use injury." Lagos Declaration at 4. During this time period, Pilgrim's Pride assigned Mitchell to a light duty position, picking feathers off chickens in the Picking Room, but returned him to live hanging when his shoulder pain appeared to improve. Mitchell Affidavit at ¶ 4. However, when Mitchell resumed his former duties, his shoulder pain returned. Mitchell Deposition at 57-58; Mitchell Deposition, Medical Records at 14. Over the next few months, in attempting to treat Mitchell's shoulder pain, his doctors imposed a variety of work restrictions including prohibiting him from reaching over his head and limiting the amount of weight he could lift and carry. See Lagos Declaration at 4, 30, 37, 40, 43; Mitchell Deposition, Medical Records at 17-34.

As a result of his ongoing pain, and in response to the doctor's orders, Pilgrim's Pride transferred Mitchell to the MSC Department (mechanically separated chicken) where he ground chicken bones. Mitchell Deposition at 77-79. His tasks also included making and stacking boxes. Id. at 80. Mitchell contends that in stacking and making the boxes, he further strained his shoulder, and had to work under conditions that were outside the scope of his medical restrictions. Mitchell Affidavit at ¶ 6; Mitchell Deposition at 81. At the time, however, Mitchell did not complain to anyone about working outside the scope of his medical restrictions because he felt he could not tell his supervisors "no."

Mitchell Affidavit at ¶ 6.  In response to an Interrogatory asking Mitchell to "identify any and all requests you have made to anyone at Pilgrim's Pride regarding desired accommodations," Mitchell responded that he "didn't request any accommodations from anyone."  Mitchell Deposition Attach. at 8.

Mitchell's left shoulder became progressively problematic, and on January 12, 2015, he had surgery to repair a tear on his left rotator cuff.  Lagos Declaration at 4; Mitchell Deposition, Medical Records at 35.  Mitchell returned to work on January 25, 2015, with doctor's orders requiring no lifting, no use of his left shoulder, and attendance at physical therapy.  Lagos Declaration at 5; Mitchell Deposition at 61-62.  Mitchell's doctor also directed him to keep his left arm in a sling while at work.  Mitchell Affidavit at ¶ 48; Mitchell Deposition, Medical Records at 38.  To accommodate the doctor's restrictions, Pilgrim's Pride assigned Mitchell to the Picking Room at the same rate of pay he earned while in the Live Shed.  Lagos Declaration at 5; Mitchell Affidavit at ¶ 8; Mitchell Deposition at 60, 90, 94; Mitchell Deposition Attach. at 109.

From January until late August of 2015, Mitchell had regular follow-up visits with his doctor, as well as with the Pilgrim's Pride occupational health nurse, Gay Papoi.  Lagos Declaration at 5; Mitchell Deposition, Medical Records at 37-52; Papoi Deposition at 45.  Mitchell's doctor continued to impose a variety of work restrictions on him as his shoulder healed, but the restrictions became less onerous over time.  For example, Mitchell's initial January 2015 post-operative restriction barred him from any lifting or use of his shoulder, but by July of 2015, Mitchell's doctor reduced his medical restrictions to lifting no more than ten pounds and no reaching overhead, along with ordering that he continue physical therapy.  Lagos Declaration at 5-6.

During meetings with Mitchell, Nurse Papoi recalls counselling Mitchell that "hanging chickens is not advised after shoulder surgery," and asking him to think "about a different job, and to watch the bulletin board for jobs to bid on." Papoi Deposition at 14-15, 45. On at least one other occasion during his recovery process, Papoi recalls advising Mitchell in the presence of his immediate supervisor, Burnham, of the "hazards to his post-operative shoulder if he were to start hanging birds again . . . ." Id. at 45. Mitchell recalled his regular meetings with Papoi, but denies that she suggested that he should think about a job other than live hanging, or that live hanging could lead to additional shoulder injuries. Mitchell Affidavit at ¶ 18; Mitchell Deposition at 108.

As Mitchell's shoulder incrementally improved and when the live hang line got busy, Mitchell's supervisors would ask him to work in the Live Shed performing a variety of tasks. Mitchell Affidavit at ¶¶ 8-9; Mitchell Deposition at 90, 91. Mitchell testified that on several occasions, Johnson had him perform secondary live hanging duties, which included retrieving dead chickens that had fallen off the live hang line and into a vat, and then throwing the chickens back on the assembly line. Mitchell Affidavit at ¶ 8; Mitchell Deposition at 63-64. Mitchell also stated that he occasionally engaged in rehanging birds. Mitchell Deposition at 60, 64, 90; Mitchell Deposition Attach. at 109. Mitchell performed some of these activities while he was still wearing the sling on his left arm. Mitchell Affidavit at ¶ 8; Mitchell Deposition at 63, 91. Mitchell acknowledged that this work did not involve the same type of physical activity as live hanging, but stated that it nonetheless exacerbated his shoulder pain. Mitchell Deposition at 64. According to Mitchell, once he was no longer required to wear the sling, his "supervisors began to demand more physical tasks from [him], even though [he] was still under medical restrictions [at the time to not]

lift anything heavier than five pounds or to lift [his] arms above [his] head." Mitchell Affidavit at ¶ 9. Again, Mitchell did not specifically complain or report to anyone that he thought he was being made to perform duties inconsistent with his medical restrictions. Mitchell Deposition at 96. Mitchell stated that he did not complain because he was "trying to get better" and that he felt like he could not tell his supervisors "no." Id.

During this time period Johnson would often ask Mitchell when he would be healed and could return to live hanging. Mitchell Affidavit at ¶¶ 11, 13; Mitchell Deposition at 67, 71-72, 162. Mitchell stated that he viewed Johnson's questions as an indication that Johnson wanted Mitchell to return to that job. Mitchell Deposition at 162. Likewise, Mitchell indicated that he was "eager to return to [his] live hang position." Mitchell Affidavit at ¶ 11.

### C. Mitchell's termination from Pilgrim's Pride

On August 31, 2015, Mitchell had a scheduled doctor's appointment at which he anticipated his doctor would lift all his work restrictions. Prior to the appointment, Mitchell saw Johnson and told Johnson that he expected to receive his doctor's clearance to return to work. As such, Mitchell told Johnson he would be back in the Live Shed the following day. Johnson responded, "We'll see." Mitchell Affidavit at ¶ 12; Mitchell Deposition at 67-68. Mitchell interpreted Johnson's statement to mean that Johnson had "everything under control out there in the live shed" and did not need him because a full crew was already assigned to that area. Mitchell Affidavit at ¶ 12; Mitchell Deposition at 69-70. Johnson recalls this interaction differently. In contemporaneous notes he made regarding Mitchell's attempted return to live hanging, Johnson wrote that he told Mitchell "that he was not to live hang until nurse [Papoi] said it was OK to do so." Johnson Deposition at

51-52, 65; Riley Deposition at 39.

According to Johnson and Bobby Riley, the then Human Resources Manager, when an employee had previously been on restricted work duty due to an injury, the employee could return to full duties once the employee had been released by his doctor and cleared by the company medical team. Johnson Deposition at 33-34, 35; Riley Deposition at 60-61, 63. Therefore, even if an employee's doctor removed all work restrictions, the employee still needed to receive clearance by the medical team at Pilgrim's Pride before returning to his or her prior work position. Riley Deposition at 61. Indeed, the Pilgrim's Pride Employee Handbook explains that when an employee was restricted from work due to a work related injury, the Medical Department determines when to return the employee to full duty. Mitchell Deposition, Human Resources Attach. at 55-56 ("[t]he Medical Department will return [the employee] to regular duties as soon as physically possible. Supervisors should provide a period of conditioning for return to regular duties for the [employee] following a period [of] restricted duty and/or time lost from work."). Notably, Mitchell denies that Johnson told him that he had to be cleared by both his doctor and the company's medical team before he could resume his prior duties. Mitchell Deposition at 164.

As Mitchell expected, at his August 31, 2015 check-up, the doctor lifted all work restrictions regarding his left shoulder. However, the doctor observed that Mitchell still "experienced right shoulder pain and noted that an MRI on the right shoulder remained medically necessary." Lagos Declaration at 5-6; Mitchell Deposition, Medical Records at 53-54. Mitchell stated that the MRI was to determine whether he "was able to do full duty . . . [and to see] if everything was good." Mitchell Deposition at 101. Likewise, Mitchell

stated that his doctor told him "that the right shoulder was going to need surgery too because it didn't look too good." Mitchell Deposition at 106-07.

The following day, September 1, 2015, Mitchell arrived at work and delivered his medical paperwork to Papoi. According to Papoi, she "spoke with him regarding not hanging chickens any further as [it was] likely to cause further injury to . . . [his] left shoulder." Papoi Deposition at 45. She also noted that Mitchell's doctor ordered an MRI for his right shoulder due to Mitchell's complaints of pain. Id. Papoi did not recall specifically telling Mitchell not to return to the live hang area, but did recall giving "him the scenario that he's just had surgery on that shoulder, and its going to aggravate the shoulder again, and for his benefit, that he should not go back to live hang." Id. at 16-17. Papoi also communicated her concerns to Mitchell's supervisors, and to Riley, the Human Resources Manager, indicating that if Mitchell "goes back to live hang he would probably have pain in his shoulder again, and we'd have the whole scenario all over again." Id. at 17-18; Riley Deposition at 60. However, Papoi stated she did not specifically inform Burnham and Johnson that Mitchell "was not return [to live hanging. Rather, she] told them that it was not a good idea." Papoi Deposition at 18. In Papoi's words, she "recommended that he not return." Id. Nevertheless, in her deposition, Papoi testified that after an employee had recovered from a workplace injury, the employee could return to his former job "if the doctor . . . released [the employee] to full duty . . . ." Papoi Deposition at 36.

Mitchell also recalled his meetings with Papoi and acknowledged that she was a good caregiver. Mitchell Deposition at 112-13. While he denies that she told him he could further exacerbate his shoulder injuries if he continued to live hang chickens, he

does not suggest that either she or any other manager told him that he could return to his position in the Live Shed rather than his assigned position in the Picking Room.  Mitchell Affidavit at ¶ 18; Mitchell Deposition at 110.

Without any discussion about changing his job assignment, Mitchell proceeded to don the appropriate work attire for live hanging and reported to the Live Shed.  Mitchell Affidavit at ¶¶ 13-14; Mitchell Deposition at 68-70.  His recollection of what happened next differs from that of his supervisors.  According to Mitchell's direct supervisor, Burnham, Mitchell was observed live hanging, and Burnham "instructed [Mitchell] to stop hanging and [proceed to] . . . the picking room . . . ."  Burnham Deposition at 15-16, 48; see also Riley Deposition at 36-37.  Mitchell protested and said he had been released by his doctor to return to full duty.  Burnham Deposition at 16.  Burnham again told Mitchell he was "to work the picking room until released by nurse [Papoi, but Mitchell] refused to stop hanging," and in fact said "no" to Burnham three different times when Burnham directed him to stop and leave the work area.  Id. at 16, 18, 48.[4]  Burnham explained that because Mitchell was not cleared by the Pilgrim's Pride medical team to work in the Live Shed, he did not want him to return to that post, lest he reinjure his shoulder.  Id. at 24-25.

Although Mitchell denies that he actually hung any birds, he acknowledges that he was on the live hang line and that he did catch one chicken by the leg.  Mitchell Affidavit at ¶¶ 14-15, 17; Mitchell Deposition at 68, 169, 185-186; Mitchell Deposition Attach. at 107, 110.  Indeed, other individuals on the scene observed Mitchell holding a bird.  Mitchell Deposition Attach. at 107.  Mitchell admits that Burnham "told me to stop hanging"

---

[4] Burnham further recalled that when Mitchell defied Burnham, Burnham asked, "Are you refusing to do what I'm asking you to do?" and Mitchell answered, "Yes, I am." Id. at 16.

and testified that in response he "just walked off the line."   Mitchell Deposition at 185.

However, Mitchell denies that Burnham directed him to report to the Picking Room.

Mitchell Affidavit at ¶ 17;   Mitchell Deposition at 185.

After his exchange with Mitchell, Burnham located Johnson and told him that

Mitchell was "live hanging and did not go to the picking room as requested."   Burnham

Deposition at 48.   Johnson told Burnham that the previous day he told Mitchell that "he

was not to hang until released by the plant nurse.   [Burnham] then told [Johnson] that he

had given [Mitchell] the same instructions."   Johnson Deposition at 41, 65 ("he wasn't

allowed to hang until he was released by the nurse and we verified it.").[5]   The two men

then returned to the Live Shed where Mitchell remained.   Burnham Deposition at 48.

Because Mitchell denies that he actually hung any birds, he denies that Johnson

told him to stop hanging.   Id. at 16; Mitchell Deposition at 186.    However, he admits that

in response to Burnham and Johnson's instructions, he protested saying that his doctor

had released him to full duty.   Mitchell Deposition at 186.   According to Johnson, he told

Mitchell that while "the doctor may have cleared [him,] . . . medical at the plant [had] not

cleared [him].   Until [Johnson and Burnham received] notice from medical inside the plant"

they could not let him live hang.   Id.; see also Johnson Deposition at 36, 37-38, 40, 41.

Mitchell similarly testified that he was told the nurse had not cleared him to return to the

live hang position.   Mitchell Deposition at 164.   Mitchell also reported that Johnson "told

[him] that [he] was not needed, because [Johnson] had a full crew working in the live

---

[5] Mitchell is not entirely clear as to the substance of his conversations with Johnson regarding when and whether he could return to the Live Shed.  At one point, Mitchell suggests that Johnson did not inform him he needed clearance from the nurse before returning to the Live Shed.  Mitchell Deposition at 68.  He later suggests that perhaps this conversation did occur on August 31, but then indicates that the conversation occurred on September 1.  Id.  However, Mitchell also suggested that Johnson never informed him that he could not return to live hanging until he was cleared by the nurse to do so, or only did so on the morning of September 1.  Mitchell Affidavit at ¶ 16; Mitchell Deposition at 184-185.

shed." Mitchell Affidavit at ¶ 13. Given that Mitchell remained in the Live Shed, Johnson informed Mitchell that he was being insubordinate and that he should leave and go to Human Resources. Burnham Deposition at 16, 48; Johnson Deposition at 41-42; Riley Deposition at 33, 35, 36.

That same day, September 1, 2015, Pilgrim's Pride suspended Mitchell from his job for insubordination. Lagos Declaration at 6. The paperwork associated with Mitchell's suspension reflected that he was suspended for disobeying his supervisors' instructions "not to hang birds until further clarification" from Mitchell's doctor and the occupational and safety management team at Pilgrim's Pride. Lagos Declaration at 76. Two days later, on September 3, the Human Resources Director for the Live Oak Pilgrim's Pride plant sent Mitchell a letter advising that he had been terminated from the company. Lagos Declaration at 6, 78.[6]

### D. Mitchell's reinstatement

Mitchell submitted a union grievance challenging his dismissal. Mitchell Deposition Attach. at 105-111. Taking into account Mitchell's otherwise long tenure at the company, the fact that he was generally a good employee, and because the Pilgrim's Pride Complex Manager wanted to give him another chance, the company agreed to reinstate Mitchell on October 20, 2015. Lagos Declaration at 6, 85; Riley Deposition at 48-49, 51. However, the terms of Mitchell's reinstatement stated that he would not receive back pay for the time during which he had been terminated from Pilgrim's Pride. Additionally, Mitchell agreed he would not return to live hanging, but would be assigned to a position that would

---

[6] According to Mitchell, he did not receive the letter advising he was terminated until three weeks after his suspension. Mitchell Affidavit at ¶ 19. However, he admits submitting a grievance challenging his termination and admits that his grievance was dated September 10, 2015. Mitchell Deposition at 165-66.

not require him to reach over his head, or engage in the type of physical activities he did while in the Live Shed. Lagos Declaration at 85; Riley Deposition at 49.

When Mitchell returned to work, Pilgrim's Pride assigned him to work in the MSC Department thinking it would be better on his shoulders. Mitchell Affidavit at ¶ 22; Mitchell Deposition at 120-121. This new position paid Mitchell at a lower rate than he had earned prior to his termination. Mitchell Affidavit at ¶ 22; Mitchell Deposition at 94, 121, 131; Mitchell Deposition Attach. at 7. As a result of the lifting he had to do in the MSC Department, Mitchell's shoulders began to hurt again. On December 10, 2015, he "complained to the Occupational Health Department of reemerging pain in his left shoulder." Lagos Declaration at 6. Mitchell sought medical attention soon thereafter, and received a steroid injection in his left shoulder. Papoi Deposition at 42; Mitchell Deposition, Medical Records at 59-61. Afterwards, Mitchell's doctor released him back to work without any restrictions. Lagos Declaration at 7; Mitchell Deposition, Medical Records at 61.

Six months later, in June of 2016, Mitchell again sought medical care, complaining of increasing shoulder pain. Lagos Declaration at 7; Mitchell Affidavit at ¶ 23. When he mentioned to his MSC Department supervisor that his work was causing him pain, the supervisor advised Mitchell to find a co-worker who was willing to rotate MSC assignments with him so he could avoid the tasks that caused him pain. Mitchell Affidavit at ¶ 24; Mitchell Deposition at 128. However, Mitchell did not do so because he thought he "would have been singled out by [his] fellow employees. They would have accused [him] of not doing good work and if enough complaints [were] made by fellow workers, [he] would get fired. Bottom line, [he] was job scared." Mitchell Affidavit at ¶ 24.

Nevertheless, Mitchell did not report any specific complaints to Human Resources about his pain or work assignment.  Mitchell Deposition at 128.

After a June 21, 2016 medical appointment, Mitchell's doctor "issued restrictions of no overhead lifting and no lifting of more than ten pounds for four weeks."  Lagos Declaration at 7; Mitchell Deposition, Medical Records at 63-65.  Medical notes also reflect that Mitchell received an injection to address his pain, which made a "significant difference."  Glover Deposition at 28.  One of the company Occupational Health Nurses, Belinda Glover, noted that Mitchell requested that he be permitted to return to the Live Shed.  Id. at 14.[7]  Glover explained that the company ordered an ergonomic assessment regarding whether Mitchell could return to a live hanging assignment, but was awaiting documentation from that assessment.  Id. at 14-15, 30.

In light of Mitchell's ongoing shoulder problems, and to accommodate the most recent work restrictions from his doctor, Pilgrim's Pride transferred Mitchell to a Salvage position.  Lagos Declaration at 7, 98; Mitchell Affidavit at ¶ 25; Mitchell Deposition at 15, 122, 131; Mitchell Deposition, Medical Records at 67.  In Salvage, Mitchell's job was to cut off chicken parts that could not proceed through processing.  Mitchell Deposition at 17.  In a follow up appointment with his doctor on July 19, 2016, Mitchell's physician again released him to return to work without restrictions on his left shoulder.  Glover Deposition at 28; Lagos Declaration at ¶ 28; Mitchell Deposition, Medical Records at 69.  However, the doctor noted that Mitchell reported he "had pain when he was lifting 50-pound boxes repetitively."  Glover Deposition at 28.

---

[7] Mitchell did not recall having a conversation along these lines with Glover.  Mitchell Deposition at 124. However, he did recall her laughing when he said he wanted to return to live hanging.  Mitchell Affidavit at ¶ 18; Mitchell Deposition at 125.

Later that same month, Mitchell "complained to the Occupational Health Department of 'discomfort and heaviness in his right shoulder and bilateral arms.'" Lagos Declaration at 8; see also Glover Deposition at 8, 11. Glover administered over the counter ibuprofen to Mitchell, as well as a pain relieving gel to his shoulder. Lagos Declaration at 104. She also noted that she intended to speak to Mitchell's supervisor regarding the appropriateness of his work placement. Id.[8] Mitchell again sought medical attention in February and March of 2017, for pain in his left shoulder. Lagos Declaration at 8; Mitchell Deposition, Medical Records at 76-77, 79-80. The doctor released Mitchell "to return to work without restrictions on the left shoulder." Lagos Declaration at 8; Mitchell Deposition at 142. Throughout this time, Mitchell remained assigned to the Salvage Department. Lagos Declaration at 8.

### E. FMLA leave

During the same time period that Mitchell worked in Salvage, he applied for and was deemed eligible for FMLA leave to address his hypertension. Id. at 8, 113-127. Mitchell first received approval for FMLA leave in May of 2016 when Pilgrim's Pride permitted him to take intermittent leave. He renewed his request and was approved for FMLA leave at least two more times, through 2017 and 2018. Id. at 8, 120, 127. During this time frame, Mitchell utilized FMLA leave for at least seventeen days to attend doctor appointments associated with his hypertension. Id. at 8; Mitchell Deposition at 132; Mitchell Deposition Attach. at 15-16, 39-41, 43-45, 49-51, 55-56, 62-63, 70-72, 76-79, 82-84, 87, 89, 91, 96. Mitchell testified that he never had any problems taking FMLA leave, and received approval for all his requested FMLA intermittent leave. Mitchell Deposition

---

[8] The record before the Court on summary judgment does not indicate the outcome of Glover's conversation with Mitchell's supervisor.

at 133.

Mitchell worked in Salvage until May of 2018, at which point Pilgrim's Pride transferred him to a Neck Chiller position.  Lagos Declaration at 8; Mitchell Affidavit at ¶ 25; Mitchell Deposition at 15.  According to Mitchell, two women who worked with him in Salvage complained and "picked at him" because he took FMLA time to address his hypertension.  Mitchell Affidavit at ¶ 25; Mitchell Deposition at 16, 19, 129, 132.  He contends that as a result of their complaints, and in retaliation of his use of FMLA leave, his supervisor in Salvage transferred him to the Neck Chiller position.  Mitchell Affidavit at ¶ 25; Mitchell Deposition at 19.  In his deposition, Mitchell reported that he did not have a problem being moved to the Neck Chiller Department and that working there was "going well."  Mitchell Deposition at 20, 27.

Mitchell's duties in the Neck Chiller Department include "boxing up chicken necks.  Specifically, . . . Mitchell makes boxes and places them on a conveyor belt, where approximately 40 pounds worth of chicken necks are dropped into the box.  The conveyor belt then takes the box to second processing, where it is processed for shipment."  Lagos Declaration at 8; Mitchell Deposition at 24-27.  Mitchell reported that some of his work in the Neck Chiller Department causes him pain, but that he has not reported that pain to his supervisor or anyone in Human Resources.  Mitchell Affidavit at ¶ 26; Mitchell Deposition at 142-143.  Mitchell acknowledged that he would likely experience similar pain if he was live hanging, but stated that "you got to work through the pain no matter what you do."  Mitchell Deposition at 144.  Mitchell further stated in his January 2019 Affidavit that he currently did not have any medical restrictions, but he was "likely to have similar surgery on [his] right shoulder because of" his work in the Neck Chiller Department.

Mitchell Affidavit at ¶ 26. Mitchell also stated that his shoulder still had a lot of pain and that he used "pain patches and heat" to address it. Mitchell Deposition at 142, 145; Mitchell Deposition Attach. at 8.

### F. Comparators

Finally, Mitchell points to several employees at Pilgrim's Pride who he alleges suffered from workplace injuries that caused them pain, but were permitted to continue with their work assignments and were not subject to adverse employment actions. He first references Joyce Grantham, a white employee, who had hand surgery, but upon recovery, returned to her former position. Mitchell Affidavit at ¶ 27; Mitchell Deposition at 136. However, Mitchell has acknowledged that Grantham now works in a different division at Pilgrim's Pride because of ongoing pain in her hand. Mitchell Affidavit at ¶ 27; Mitchell Deposition at 137. He nonetheless notes that Grantham "was not suspended or terminated, and did not receive a reduction in pay." Mitchell Affidavit at ¶ 27.

Second, Mitchell points to his former supervisor, Johnson, who suffered from back issues. In his deposition, Johnson acknowledged he would occasionally "tweak" his back, whether at home or at work and that he "just toughed it out" until it got better. Johnson Deposition at 46, 47-48; Mitchell Affidavit at ¶¶ 21, 29; Mitchell Deposition at 182. Johnson testified that he received medical care for his back, but did not know if his receipt of medical care or any associated doctor's orders were included in his work personnel file. Johnson Deposition at 48-51. Riley, the Human Resources Manager at the time, noted that Johnson may very well have had a personal medical problem with his back, but Riley was not aware of whether Johnson had been placed under any work restrictions by a doctor or if Johnson had sought worker's compensation for the same. Riley

Deposition at 6, 28-29.

Next, Mitchell identifies an unnamed electrician at Pilgrim's Pride who had a fainting incident at home, but nonetheless continued in his usual work duties at the company. Mitchell Deposition at 178-79. Finally, in an affidavit attached to his Response to Pilgrim's Pride Motion, Mitchell references for the first time a white employee named Ed Conquer. Mitchell Affidavit at ¶ 10. Mitchell reports Conquer "was a maintenance guy who had injured his rotator cuff and was allowed to do his same job even with a sling on." Id. According to Mitchell, Conquer was "allowed to keep doing his job even with the injury." Id. at ¶ 28. The record suggests that all of these employees are white. Id. at ¶¶ 10, 27-28.[9]

Finally, the record before the Court makes evident that Mitchell enjoyed working as a live hanger, and despite whatever pain he may have suffered, he wanted to return to that work. He stated that if other individuals were allowed to work through their pain, he did not understand why he was not permitted to do the same. Mitchell Deposition at 182.

### G. The Instant Action

As a result of this course of events, Mitchell sued Pilgrim's Pride, alleging race discrimination (Count I), FMLA violations (Count II), and disability discrimination (Count III). In regard to his race discrimination claim, Mitchell asserts that white employees who suffered from workplace injuries were treated more favorably by Pilgrim's Pride than he was, in that they were permitted to continue working in their previous positions and were

---

[9] In his deposition, Mitchell stated that the fainting electrician is white. Mitchell Deposition at 178. Likewise, in his Affidavit, when generally discussing other "white employees who were allowed to work even when they were in pain and injured," Mitchell referenced Johnson as an example. Mitchell Affidavit at ¶ 21.

not terminated for alleged insubordination. Amended Complaint at ¶¶ 15, 18-22. Similarly, as to his disability discrimination claim, Mitchell alleges that despite receiving clearance from his doctor to return to work, Pilgrim's Pride perceived him as being disabled and refused to permit him to return to his former position, while treating similarly situated employees outside of his protected class more favorably.  Id. at ¶¶ 10, 35-36. Mitchell also suggests that upon his return to work at Pilgrim's Pride after his reinstatement, the company refused to accommodate his disabilities.  Id. at ¶¶ 13-14, 36. Finally, Mitchell alleges that Pilgrim's Pride harassed him and terminated him for taking FMLA leave and also demoted him to a "more difficult position."  Id. at ¶¶ 27-28.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[10]  An issue is genuine when the evidence

---

[10] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."  United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case.").  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir.

1994)).

### III. Discussion

#### A. Race Discrimination (Count I)

The crux of Mitchell's race discrimination claim appears to be that, unlike white employees who suffered workplace injuries but were permitted to return to or continue in their jobs, Mitchell was terminated for his attempt to return to his job.

Title VII provides "that it is unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting 42 U.S.C. §§ 2000e-2(a)(1)). A plaintiff may establish a Title VII discrimination claim through the introduction of direct or circumstantial evidence or statistical proof of discrimination.[11] Lee v. U.S. Steel Corp., 450 Fed. Appx. 834, 839 (11th Cir. 2012) (citing Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010)). Where, as here, the plaintiff relies on circumstantial evidence of discrimination,[12] the Court applies the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

---

[11] Title VII encompasses disparate treatment discrimination claims as well as disparate impact claims. Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994). Mitchell has not alleged disparate impact discrimination, which involves facially neutral employment practices which have significant adverse effects on protected groups, the evidence of which usually focuses upon statistical disparities rather than specific incidents. See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807-08 (11th Cir. 2010). Here, Mitchell's race discrimination claims are premised on disparate treatment; he contends that Pilgrim's Pride took adverse employment actions against him because of his race. See Reeves, 594 F.3d at 807.

[12] Mitchell does not argue that he has presented direct evidence of intentional discrimination. A plaintiff may "present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude." Hill v. Metro. Atlanta Rapid Transit Auth., 841 F.2d 1533, 1539 (11th Cir. 1988), amended on reh'g on different grounds, 848 F.2d 1522 (11th Cir. 1988). "Direct evidence is that which shows an employer's discriminatory intent 'without any inference or presumption.'" Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000)(citation omitted). However, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination. Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989).

Alvarez, 610 F.3d at 1264.  However, a plaintiff may also present "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Edmond v. Univ. of Miami, 441 Fed. Appx. 721, 723 (11th Cir. 2011) (citing Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)).   When relying on the McDonnell Douglas framework to support a claim of discrimination, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  A plaintiff establishes a prima facie case of discrimination under Title VII by showing: "(1) [he] is a member of the protected class; (2) [he] was subjected to adverse employment action; (3) [his] employer treated similarly situated [white] employees more favorably; and (4) [he] was qualified to do the job." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (internal quotations omitted) (fourth alteration in original); see also Holifield, 115 F.3d at 1562.  With regard to the similarly situated employees element, a plaintiff proceeding under McDonnell Douglas must show that he and his comparators are "similarly situated in all material respects." Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1226 (11th Cir. 2019).  If a plaintiff cannot identify a similarly situated comparator who was treated more favorably than himself, "summary judgment is appropriate where no other evidence of discrimination is present."  Holifield, 115 F.3d at 1562.

If the plaintiff presents a prima facie case, that evidence "creates a presumption that the employer unlawfully discriminated against the employee," then the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-56 (1981); Alvarez, 610 F.3d at 1264.  If the defendant meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for

unlawful discrimination and was not the "true reason for the employment decision." Burdine, 450 U.S. at 256; Alvarez, 610 F.3d at 1264; Holifield, 115 F.3d at 1565 ("[T]he plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." (citing McDonnell Douglas, 411 U.S. at 804)). A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against [him]." Alvarez, 610 F.3d at 1264.

Pilgrim's Pride argues that Mitchell has failed to establish a prima facie case of race discrimination. It first contends that Mitchell is "not a qualified individual for the purposes of the live hang position because he cannot safely perform the essential functions of the position due to his ongoing shoulder issues." Motion at 19. Next, the company argues that Mitchell cannot show that he was treated less favorably than similarly situated individuals outside of his protected class. Id. at 16-17, 19. Finally, the company asserts that it had legitimate, non-discriminatory business reasons for terminating Mitchell and then reinstating him to positions other than in the Live Shed. Id. at 20-23.

In response, Mitchell argues that genuine issues of material fact remain, particularly in regard to Pilgrim's Pride's argument that it legitimately terminated him for being insubordinate. In this regard, Mitchell contends he did not engage in insubordination, and hence his termination was pretextual. Response at 16-18. Mitchell

also argues that Pilgrim's Pride treated him less favorably than at least two white employees. Id. at 14-15. Moreover, he asserts that he was qualified to perform the essential functions of the live hang position. Id. at 9-11.

Upon careful review of the record before the Court, and drawing all reasonable inferences in Mitchell's favor, Haves, 52 F.3d at 921, the Court determines that no genuine issues of material fact exist as to Mitchell's claim of race discrimination. Mitchell is unable to make a prima facie case of race discrimination because the record does not demonstrate that Pilgrim's Pride treated similarly situated white employees more favorably than it treated Mitchell. Moreover, even if Mitchell was able to satisfy all the elements for the prima facie case, McCann, 526 F.3d at 1373, he has not identified any genuine issues of material fact regarding whether the company's stated reasons for terminating him, and for reinstating him to a less desirable position, were a pretext for racial discrimination.

In his Response, Mitchell identifies two white employees, Joyce Grantham and Ed Conquer, who he asserts were similarly situated to him in terms of workplace injuries, but were not terminated or reinstated to less desirable work positions. Response at 14. Pilgrim's Pride argues that the Court should disregard any information about Conquer, because Mitchell first identified Conquer in an affidavit attached to his Response, submitted two and a half months after the discovery deadline. See Reply at 1-3; Mitchell Affidavit at ¶¶ 10, 28; Doc. 41 (Third Amended Case Management and Scheduling Order). Pilgrim's Pride contends that by referencing Conquer for the first time in the Response, Mitchell failed to comply with the disclosure mandates laid out in Rules 26(a) and (e). See Reply at 1-3. As such, the company argues that pursuant to Rule 37(c)(1), Mitchell

should not be permitted to use the information not properly disclosed.  See id.; see also Rule 37(c)(1) (providing that where a party fails to comply with discovery disclosure rules, Rule 37 directs that "the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless.").

The Court need not determine whether Mitchell's tardy identification of Conquer warrants the sanction of exclusion because even viewing the evidence before the Court in the light most favorable to Mitchell, Haves, 52 F.3d at 921, neither Conquer or Grantham satisfy the standard of what constitutes a similarly situated employee for the purposes of establishing a prima facie case of race discrimination.

In Lewis, the Eleventh Circuit Court of Appeals held that in identifying comparators for the purposes of a discrimination claim, the "plaintiff must show that [he] and [his] comparators are 'similarly situated in all material respects.'"  Lewis, 918 F.3d at 1224. The Court noted that "a plaintiff and his comparators need not be similar in all but the protected ways."  Id. at 1227.  As such a plaintiff need not demonstrate that he and his comparators are "identical save for their race or gender, as the case may be," or that he and the potential comparator performed identical job functions.  Id. (citations omitted). The Court went on to describe the types of similarities that "will, in the main, underlie a valid comparison."  Id.

> Ordinarily, for instance, a similarly situated comparator . . . will have engaged in the same basic conduct (or misconduct) as the plaintiff, . . . will have been subject to the same employment policy, guideline, or rule as the plaintiff, . . . will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, . . . and . . . will share the plaintiff's employment or disciplinary history. . . .  In short, as its label indicates –"all material respects" – a valid comparison will turn not on formal labels, but rather on substantive likenesses. . . . [A] plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.

Id. at 1227–28 (citations and quotations omitted).  Applying this standard, the Court finds that Mitchell has failed to point to any evidence supporting a conclusion that either Grantham or Conquer are similarly situated to him "in all material respects."  Id. at 1224.

Painted with the broadest of strokes, there is some similarity between Mitchell, Grantham, and Conquer.  Mitchell argues that like Grantham and Conquer, he suffered from a workplace injury.  Mitchell Affidavit at ¶¶ 10, 27-28; Mitchell Deposition at 136-38. However, he contends that unlike these white co-workers who were permitted to return to their former positions, or were able to work while injured, when Mitchell attempted to return to work, he was terminated, and then reinstated to a lower paid position.  Mitchell Affidavit at ¶¶ 10, 27-28; Mitchell Deposition at 136;  Mitchell Response at 3, 8. 14-15.

As explained in Lewis, in evaluating whether an individual is a similarly situated comparator, courts should inquire into, among other things, whether the comparator

> engaged in the same basic conduct (or misconduct) as the plaintiff, . . . [was] subject to the same employment policy, guideline, or rule as the plaintiff, . . . [and was] . . . ordinarily (although not invariably) . . . under the jurisdiction of the same supervisor as the plaintiff . . . .

Lewis, 918 F.3d at 1227-28.  Thus, to determine whether the individuals identified are similarly situated to Mitchell in all material respects, the Court must determine what the undisputed facts reflect with regard to Mitchell's termination and reinstatement.

Mitchell suffered a work related shoulder injury requiring surgery.  As he was recovering from that surgery, his doctor imposed physical restrictions that prevented Mitchell from doing his regularly assigned job in the Live Shed.  Lagos Declaration at 5; Mitchell Deposition at 61-62.  Pilgrim's Pride accommodated the restrictions by reassigning Mitchell to the Picking Room.  Lagos Declaration at 5; Mitchell Affidavit at ¶

8; Mitchell Deposition at 60, 90; Mitchell Deposition Attach. at 109.   On August 31, 2015, Mitchell had a doctor's appointment at which he expected to be cleared to return to full duty.   He advised Johnson of his expectation that he would return to the Live Shed the next day and Johnson responded, "We'll see."   Mitchell Affidavit at ¶ 12; Mitchell Deposition at 67-68.   Johnson also advised Mitchell that he had a full crew in the Live Shed.   Mitchell Affidavit at ¶ 12; Mitchell Deposition at 69-70.

Prior to September 1, 2015, Nurse Papoi had advised Johnson and Burnham of her concern that Mitchell should not return to live hanging.   Papoi Deposition at 45.   Before a Pilgrim's Pride employee working restricted duty due to a workplace injury can return to his former position, the employee must be cleared by the Medical Department.   Johnson Deposition at 33-34, 35; Riley Deposition at 60-61, 63.   Based on Mitchell's recent surgery and the doctor's notation regarding right shoulder pain and the need for an MRI, Papoi recommended to Mitchell's supervisors that he not return to live hang duties.   Papoi Deposition at 16-17.

On the morning of September 1, 2015, Mitchell was still assigned to the Picking Room.   Riley Deposition at 35-36.   Despite this, after seeing Papoi, Mitchell donned his live hang clothing and reported to the live hang line.   Mitchell Affidavit at ¶¶ 13-14; Mitchell Deposition at 68-70.   Although Mitchell denies that he actually engaged in live hanging, he admits being in the Live Shed, on the line, dressed for duties as a Live Hanger, and holding one bird by the leg.   Mitchell Affidavit at ¶¶ 14-15, 17; Mitchell Deposition at 68, 169, 185-186; Mitchell Deposition Attach. at 107, 110.   Mitchell does not dispute that Burnham found him there and ordered him to stop.   Mitchell Deposition at 185. Additionally, while Mitchell denies that he was specifically directed to go to the Picking

Room, he does not dispute that in response to Burnham's directions he merely walked off the line but remained in the Live Shed arguing that his doctor had released him to full duty. Mitchell Affidavit at ¶ 17; Mitchell Deposition at 185. Mitchell also admits that both Johnson and Burnham told him that he had to be released by the nurse before he could return to live hanging. Mitchell Deposition at 164. Moreover, he does not dispute that he failed to leave the Live Shed despite being told by Johnson that he was not needed in the Live Shed because they had a full crew. Mitchell Affidavit at ¶ 13. After which, Johnson told Mitchell he was being insubordinate and directed him to report to Human Resources. Burnham Deposition at 16, 48; Johnson Deposition at 41-42; Riley Deposition at 33, 35, 36.

Thus, regardless of whether Mitchell actually hung a bird in the Live Shed or not, or whether he was specifically told to go to the Picking Room, it is undisputed that Mitchell's assigned job on September 1, 2015, was in the Picking Room. It is further undisputed that when Burnham found Mitchell in the Live Shed, he ordered Mitchell to stop his activities and Mitchell remained in the Live Shed. Burnham Deposition at 16, 18, 48. Moreover, when Burnham asked Mitchell if he was refusing to follow orders, Mitchell answered in the affirmative. Id. at 16. Likewise, when Johnson ordered Mitchell to stop his activities on the live hang line Mitchell remained, arguing that his doctor had released him. And it is undisputed that Mitchell remained in the Live Shed throughout his interaction with both Burnham and Johnson until Johnson told Mitchell he was insubordinate which resulted in Mitchell's termination from Pilgrim's Pride. Burnham Deposition at 16, 48; Johnson Deposition at 42; Lagos Declaration at 6, 76, 78; Riley Deposition at 33, 35, 36.

Mitchell contends that he was not insubordinate because he did not actually hang any birds, and hence could not stop an activity (i.e., live hanging birds) that he was not doing.  Response at 4-5, 18.  As such he compares his treatment to that of Grantham and Conquer, arguing that "other, white employees were not terminated for returning to work and performing their jobs following an injury."  Id. at 18.  In doing so Mitchell simply mischaracterizes the reason for his termination.  The record does not support his contention that he was terminated for returning to work after an injury.  Instead the undisputed facts reflect that Mitchell was terminated after he unilaterally returned to his prior position and remained there in defiance of company policy and orders from supervisors, which they considered to be insubordination.

In identifying Grantham and Conquer as comparators, Mitchell points to no evidence that would permit a reasonable jury to conclude that either was similarly situated to him in all material respects.  Mitchell provides no information about the medical condition suffered by either.  He does not contend that either, like him, returned to work with physical restrictions, much less restrictions that prevented either from doing his or her previously assigned job.  Mitchell does not suggest that either of them, after being assigned to a different position to accommodate medical restrictions, attempted to return to his or her prior job without direction or approval of any supervisor, or without clearance from the medical department.  And, notably, Mitchell points to no evidence suggesting that either of these individuals failed to report to his or her assigned position after being told that he or she was not needed because a full crew was present.  In short, Grantham and Conquer, like Mitchell, suffered a work related injury, but on the record before the Court, the similarity ends there.  Mitchell simply presents no evidence supporting a

conclusion that these employees were similar to him in all material respects.  Lewis, 918 F.3d at 1224.  Indeed, Mitchell does not even suggest that either engaged in any behavior that could be construed as workplace insubordination, but were not dismissed for their misbehavior.  As such, neither Grantham nor Conquer are similarly situated to Mitchell for the purposes of establishing a prima facie case of race discrimination.[13]  In the absence of similarly situated comparators who were treated more favorably than Mitchell, and with no other evidence of discrimination, summary judgment in favor of Pilgrim's Pride is appropriate.  Holifield, 115 F.3d at 1562.

Even if Mitchell were able to satisfy the required elements for a prima facie case of race discrimination, see McCann, 526 F.3d at 1373, Pilgrim's Pride has presented legitimate non-discriminatory reasons for its adverse employment actions against him. The company asserts it terminated Mitchell for insubordination after he reported to work in the Live Shed and failed to comply with Burnham and Johnson's directions.  See Burnham Deposition at 16, 48; Johnson Deposition at 42; Lagos Declaration at 6, 76, 78; Riley Deposition at 33, 35, 36.  The company further states that upon reinstating Mitchell, it sought to place him in a work environment that would not exacerbate his ongoing shoulder pain and injury.  See Lagos Declaration at 85; Riley Deposition at 49.  Mitchell has not pointed to any evidence creating an issue of fact as to either of these assertions. Nor has he established that genuine issues of material fact exist demonstrating that the company's proffered reasons for its treatment of Mitchell were pretext for race

---

[13] The Court notes that Mitchell does not reference Johnson or the fainting electrician as potential comparators for his race discrimination claim.  Response at 14-15.  However, even if Mitchell were to rely on these additional individuals as comparators, neither would satisfy the Lewis standard, largely for the same reasons articulated above for Grantham and Conquer.  Nothing in the record suggests that either Johnson or the fainting electrician were assigned to a position to accommodate a doctor's physical restrictions and then unilaterally attempted to return to his prior position.  Hence, neither Johnson nor the fainting electrician can serve as viable comparators for Mitchell.

discrimination.  See Burdine, 450 U.S. at 256; Alvarez, 610 F.3d at 1264; Holifield, 115 F.3d at 1565.  Indeed, he points to no evidence suggesting that any decision regarding his employment was motivated by racial discrimination.

In order to show pretext, a plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision."  Burdine, 450 U.S. at 256.  A reason cannot be a "pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original, quotations omitted).  So long as the employer's "reason is one that might motivate a reasonable employer, [the] employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000); see also Alvarez, 610 F.3d at 1256 ("[The Court does] not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions — indeed the wisdom of them is irrelevant — as long as those decisions were not made with a discriminatory motive." (quoting Chapman, 229 F.3d at 1030)).  In this regard, an "employer may [take action against] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  Walton v. Cives Corp., 491 Fed. Appx. 29, 32 (11th Cir. 2012) (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) abrogated in part by Lewis, 918 F.3d at 1218).  A plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could

find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).

Significantly, at this stage, the plaintiff's burden of demonstrating that the employer's proffered reason was not the true reason for his termination "merges with the [plaintiff's] ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." Burdine, 450 U.S. at 256. Thus, "the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." Smith, 644 F.3d at 1325. In this respect, while the absence of a comparator is not fatal to a plaintiff's Title VII claim, the presence or absence of a comparator is relevant, as is other circumstantial evidence, to whether the plaintiff can prove that the adverse employment action was the result of discrimination. Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1154 (11th Cir. 2005); see also Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination").

Pilgrim's Pride argues that the company

decided not to return [Mitchell] to the live hang position after he was released without restrictions to his left shoulder on August 31, 2015, because [Michell] was still complaining of pain in his right shoulder and still needed an MRI of his right shoulder, and was at an increased risk of re-injury to his post-operative left shoulder.

Motion at 20 (emphasis in original). Reviewing the record before the Court in the light most favorable to Mitchell, Haves, 52 F.3d at 921, the evidence does not demonstrate

that the company's stated reasons for refusing to reinstate Mitchell to live hang duties were false and otherwise motivated by racism.  Chapman, 229 F.3d at 1030.

In the eight months following Mitchell's shoulder surgery, he had regular check-ups with his doctor, as well as with the Pilgrim's Pride occupational nurse.  Lagos Declaration at 6; Mitchell Deposition, Medical Records at 37-52; Papoi Deposition at 45.  As his shoulder healed, his doctor progressively lessened his work restrictions, finally lifting all restrictions regarding his left shoulder on August 31, 2015.  Lagos Declaration at 5; Mitchell Deposition, Medical Records at 37-54; Papoi Deposition at 45.  However, at that same time, Mitchell's doctor observed that Mitchell was still experiencing "right shoulder pain and noted that an MRI on the right shoulder remained medically necessary."  Lagos Declaration at 5-6; Mitchell Deposition, Medical Records at 53-54.  As Mitchell himself acknowledged in his deposition, the reason he needed to have the MRI was to determine whether he "was able to do full duty . . . [and to see] if everything was good."  Mitchell Deposition at 101.  He also stated that his doctor informed him that he would need surgery on his right shoulder because "it didn't look too good."  Mitchell Deposition at 106-07.  While Mitchell disputes that Papoi communicated her concern that Mitchell could aggravate his shoulder if he returned to live hanging, he does not dispute that Papoi informed his supervisors that if he returned to live hanging, Mitchell would probably experience more pain in his shoulders, thereby repeating the injury from which he had just recovered.  Papoi Deposition at 17-18.  Nor does he dispute that Papoi informed his supervisors that having him return to live hanging was "not a good idea."  Id. at 18.

The record also reflects that pursuant to Pilgrim's Pride's employment policies, when an employee had been on restricted work duty due to a workplace injury, the employee could not return to the former position until released by his doctor and cleared by the company medical team. Johnson Deposition at 33-34, 35; Riley Deposition at 60-61, 63. Additionally, both Johnson and Burnham testified that it was their understanding that Mitchell could not return to live hanging until he received clearance from the company nurse to do so. Burnham Deposition at 16; Johnson Deposition at 41, 65. Burnham also stated he did not want Mitchell to return to live hanging until Mitchell received clearance from the company medical team, so as to prevent future injury to his shoulders. Burnham Deposition at 15, 25. And indeed, Papoi had not recommended that Mitchell return to live hanging before he unilaterally reported to the Live Shed. On this record, even if no one at Pilgrim's Pride informed Mitchell of their concerns regarding how live hanging could further injure his shoulders, and even if Mitchell was not sufficiently informed regarding the required process to return to full duty after being under medical work restrictions, he points to no evidence supporting an inference that the true reason Pilgrim's Pride opted not to return him to work in the Live Shed was based on impermissible racial reasons, rather than the company's ongoing concerns regarding Mitchell's physical well-being and recovery from his on duty injury. Chapman, 229 F.3d at 1030.[14]

Similarly, the record before the Court, even when viewed in a light most favorable to Mitchell, Haves, 52 F.3d at 921, fails to support even an inference that when Pilgrim's Pride terminated Mitchell for insubordination, that reason was merely pretext for race discrimination. The day before Mitchell attempted to return to live hanging, he informed

---

[14] The record also reflects that Johnson told Mitchell that he was not presently needed for live hanging because Johnson already had a full crew working in the Live Shed. Mitchell Affidavit at ¶ 13.

Johnson that he expected his doctor was going to clear him for full duty, and therefore he would be back in the Live Shed the following day. Johnson responded, "We'll see," which Mitchell interpreted as meaning that Johnson had "everything under control out there in the live shed" and did not need him to fulfill duties in that workspace. Mitchell Deposition at 69-70. Regardless, the following day, Mitchell dressed for work in the Live Shed and entered that area, rather than reporting to his assigned position in the Picking Room. Riley Deposition at 35-36. Despite being directed by two supervisors to cease activities in the Live Shed, Mitchell remained there until being ordered to report to Human Resources for insubordination.

In support of his claim, Mitchell cites to Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999), for the proposition that when an employer justifies terminating an employee for violating a work rule, that "defense is arguably pretextual when a plaintiff submits evidence (1) that [he] did not violate the cited work rule, or (2) that if [he] did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." Id. at 1363. Here, however, Mitchell cannot satisfy either option identified in Damon.

First, Mitchell suggests that the company's accusation of insubordination against him was based on whether or not he actually engaged in live hanging birds. He asserts that he could not have violated an order telling him not to live hang birds, when he never actually did so. See Mitchell Affidavit at ¶¶ 15, 17; Mitchell Deposition at 68, 169, 186; Mitchell Deposition Attach. at 107, 110. However, as discussed above, the record before the Court establishes that the circumstances surrounding Mitchell's termination did not rest solely on whether he had or had not engaged in the process of live hanging birds.

Rather, the record demonstrates that Mitchell's supervisors deemed him insubordinate for not following their directions. In fact, Mitchell affirmed to Burnham that he was not following Burnham's orders. Moreover, regardless of whether Mitchell actually hung a bird, instead of reporting to his assigned job in the Picking Room, Mitchell dressed for live hanging, he reported to the Live Shed, and was observed holding a bird, all in apparent contradiction to company rules regarding when and how an employee who had been on restricted duty could return to his former position. Additionally, he did so despite being informed that the company had a full crew for the Live Shed. In this way, Mitchell defied his supervisors' instructions. Therefore, Mitchell cannot satisfy the first avenue laid out in Damon.

In addressing the second Damon consideration, Mitchell attempts to frame his potential workplace infraction as "returning to work and performing [his job] following an injury." Response at 18. However, as previously discussed, Pilgrim's Pride did not terminate Mitchell for seeking to return to his job once his doctor lifted his medical restrictions on his left shoulder. Rather, Pilgrim's Pride terminated Mitchell for not following his supervisors' orders. The record is devoid of any evidence supporting an inference that either Grantham or Conquer engaged in any form of insubordination, but nonetheless escaped discipline. Accordingly, Mitchell cannot rely on the second path identified in Damon. Thus, Mitchell's reliance on Damon is unavailing because he can neither establish the existence of a genuine issue of fact on the question of whether he was insubordinate or whether any similarly situated employee was treated more favorably.

Certainly, Mitchell may well believe that his supervisors acted precipitously when they terminated him for insubordination, rather than engaging in some form of progressive discipline. He contends that even if he had been insubordinate, "skipping the entire progressive discipline policy makes little sense." Response at 17. Therefore, he asserts the company's claim that it terminated him for insubordination was pretext for racial discrimination. However, the Employee Handbook states that "certain forms or instances of misconduct, rule violations, <u>insubordination</u> and other activities can result in disciplinary action of . . . suspension and or discharge <u>for one offense</u>." Mitchell Deposition, Human Resources Attach. at 20 (emphasis added). The company's standards of conduct also advise all employees that "'[f]ailure to follow instructions or perform designated work' is grounds for 'corrective action, up to and including termination.'" Lagos Declaration at 3. Moreover, the Court does "not sit as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions — indeed the wisdom of them is irrelevant — as long as those decisions were not made with a discriminatory motive." <u>Alvarez</u>, 610 F.3d at 1256. Here, Mitchell has failed to rebut Pilgrim's Pride's proffered reason that it terminated him for insubordination. He has not put forth evidence raising a genuine issue of material fact that the company terminated him because of his race.

To the extent that Mitchell's claim of race discrimination includes an allegation that Pilgrim's Pride discriminated against him when upon his reinstatement it placed him in a position with lower pay, summary judgment is also due to be granted in favor of Pilgrim's Pride. <u>See</u> Amended Complaint at ¶ 13 ("When Plaintiff returned to work, he was placed in a new demoted position . . . ."); ¶ 15 ("Plaintiff has also been treated differently than a

nearly identical white employee who sustained the same or a similar injury to Plaintiff but was not relocated to another position after his injury nor demoted."). For many of the same reasons the Court rejected Mitchell's argument that Pilgrim's Pride terminated him on the basis of his race, the Court likewise concludes that the record does not support the inference that when Pilgrim's Pride reinstated Mitchell to a lower paying position, the company was racially motivated in doing so.

Again, Mitchell has not identified any white employees "similarly situated in all material respects" to him, Lewis, 918 F.3d at 1224, who after being terminated from Pilgrim's Pride for insubordination, were then reinstated to their former positions. At most, the record before the Court shows that other employees, like Mitchell, suffered workplace injuries and experienced pain. Johnson Deposition at 46, 47-48; Mitchell Affidavit at ¶¶ 10, 21, 27-29; Mitchell Deposition at 136, 178-79, 182. Moreover, the undisputed record establishes that Pilgrim's Pride, in placing Mitchell in a position other than live hanging, attempted to ensure that upon his reinstatement, any new post would not further exacerbate his shoulder condition. Mitchell Deposition at 120-121; Riley Deposition at 49. Mitchell has failed to put forth evidence raising a genuine issue of material fact that Pilgrim's Pride's reasons for not reinstating as a Live Hanger out of a concern for his physical well-being, were pretextual, and that the company was otherwise motivated by his race. For all of the foregoing reasons, the Court concludes that the record does not demonstrate any issues of material fact in regard to Mitchell's claim of race discrimination, and summary judgment is due to be entered in favor of Pilgrim's Pride on Count I.

### B. FMLA Violation (Count II)

In Count II, Mitchell asserts that Pilgrim's Pride interfered with his ability to use his

FMLA leave and also retaliated against him for doing so. Amended Complaint at ¶ 27-28. "The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)) (alteration in Hurlbert). "The FMLA provides that leave for a serious health condition need not be taken as a 12 week block but rather may be taken 'intermittently or on a reduced leave schedule when medically necessary.'" Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1204 n.4 (11th Cir. 2001) (quoting 29 U.S.C. § 2612(b)(1)). In addition, the FMLA grants an eligible employee who takes leave under the FMLA the right, upon returning from such leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. 29 U.S.C. § 2614(a)(1). In recognition of these rights, the FMLA further "creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." Hurlbert, 439 F.3d at 1293 (quotation omitted). The Eleventh Circuit Court of Appeals has recognized two types of claims arising under the FMLA: "'interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'" Id. (citation omitted).

In his Amended Complaint, Mitchell asserts that Pilgrim's Pride harassed him for "using leave time for a known serious medical condition, and [terminated] Plaintiff for

taking time off that was protected under the FMLA." Amended Complaint at ¶ 27. More particularly, Mitchell alleges that

> [a]fter taking time for serious health conditions, Defendant harassed Plaintiff and took adverse personal actions against him for using leave and refused to return him to the position from which he left prior to his protected leave. Defendant then fired him and when he was reinstated pursuant to a union grievance, demoted him to a more difficult position to perform in light of his prior medical condition and surgery.

Id. at ¶ 28. Importantly, the allegations in Mitchell's Amended Complaint relate to events occurring in 2015, and during the time Mitchell was assigned to the MSC Department following his reinstatement at Pilgrim's Pride. Id. at ¶ 14. Indeed, he specifically asserts that at the time he filed the Amended Complaint in July of 2017, he was working in the MSC position. Id. ("The job that Plaintiff now holds, the MSC position . . . .").

Despite this, in Mitchell's Response, he also argues about events that occurred after Pilgrim's Pride transferred him from the MSC position to the Salvage Room. He suggests that as a result of his use of FMLA leave, he was transferred to a Salvage position and then to a Neck Chiller post. Response at 7-8. Specifically, he argues that when his supervisor transferred him to the Neck Chiller position in 2018, the supervisor did so in retaliation of his use of FMLA time for his hypertension. Response at 7-8, 18-19; Mitchell Affidavit at ¶¶ 25-26. The Court will not entertain these new arguments.

The facts alleged in Mitchell's response regarding his transfer from Salvage to the Neck Chiller Department occurred in May of 2018, nearly a year after he filed his Amended Complaint. As such, the Court interprets Mitchell's new framing of his FMLA claim as an attempt to further amend his complaint. He cannot do so. Eleventh Circuit precedent precludes a plaintiff from amending his complaint through argument at the summary judgment phase of proceedings. See Flintlock Constr. Servs., LLC v. Well-

Come Holdings, LLC, 710 F.3d 1221, 1228 (11th Cir. 2013).  As such, the Court will not consider Mitchell's new allegations and will limit its FMLA analysis to the allegations laid out in his Amended Complaint.

### 1. Interference

In his Amended Complaint, Mitchell generally asserts that after he took "time for serious health conditions," Amended Complaint at ¶ 28, Pilgrim's Pride harassed him, terminated him, took adverse personal actions against him, refused to return him to his prior work position, and demoted him to a more difficult position.  Id. at ¶¶ 27-28. However, to the extent that Mitchell's Amended Complaint can be fairly construed as alleging a FMLA interference claim, on the record before the Court no reasonable jury could conclude that Pilgrim's Pride interfered with Mitchell's FMLA rights.

"To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA."  Martin v. Brevard County Pub. Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008); see also Hurlbert, 439 F.3d at 1293 ("To establish an interference claim, 'an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied.'") (quotation omitted).  Thus, to prevail on an interference claim, the employee must show that he "(1) was entitled to a benefit under the FMLA, and (2) [his] employer denied [him] that benefit."  White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015) (citing Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010)).  Additionally, the employee must show "that [he] 'has been prejudiced by the violation in some way.'"  Evans v. Books-A-Million, 762 F.3d 1288, 1295 (11th Cir. 2014) (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)).  The employee does not have to prove "that his employer

intended to deny the benefit, because 'the employer's motives are irrelevant.'" <u>Krutzig</u>, 602 F.3d at 1235 (quoting <u>Strickland</u>, 239 F.3d at 1208).

Although after filing his Amended Complaint Mitchell in this action requested and took FMLA leave to care for his hypertension, <u>see</u> Lagos Declaration at 8, 112-127, he never sought or used FMLA leave to address his ongoing shoulder problems, nor did he take any FMLA time to obtain treatment for his shoulders. Therefore, to the extent Mitchell alleges that Pilgrim's Pride violated the law in terms of how it responded to him taking time off of work to address his shoulder conditions, and how it responded to his attempt to return to live hanging after he recovered, his FMLA claim is misplaced.[15]

## 2. Retaliation

Mitchell also appears to argue that Pilgrim's Pride retaliated against him for using his FMLA leave by refusing to let him return to the live hang position, by terminating him, and then reinstating him in a less desirable position. Amended Complaint at ¶ 28. "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." <u>Strickland</u>, 239 F.3d at 1207. "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" <u>Id.</u> (quoting <u>King v. Preferred Technical Group</u>, 166 F.3d 887, 891 (7th Cir. 1999)). When a

---

[15] Notably, the record demonstrates that Pilgrim's Pride has not otherwise interfered with Mitchell's FMLA rights. Mitchell applied for and obtained FMLA leave in May of 2016, and upon his further applications, extended his FMLA coverage through 2017 and 2018. <u>Id.</u> at 8, 120, 127. During this time period, Mitchell requested and was permitted to take at least seventeen days to seek medical care for his hypertension. <u>Id.</u> at 8; Mitchell Deposition at 132; Mitchell Deposition Attach. at 15-16, 39-41, 43-45, 49-51, 55-56, 62-63, 70-72, 76-79, 82-84, 87, 89, 91, 96. Nothing in the record suggests that Pilgrim's Pride in any way either denied or interfered with his ability to exercise his rights under the FMLA.

plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, courts apply the same burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas</u>. <u>Id.</u> "A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." <u>Krutzig</u>, 602 F.3d at 1234. "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" <u>Id.</u> (quoting <u>Brungart v. BellSouth Telecomm., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000)). "Once the employee establishes a prima facie case of retaliation, the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" <u>Martin</u>, 543 F.3d at 1268 (quoting <u>Hurlbert</u> 439 F.3d at 1297). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" <u>Id.</u> (quoting <u>Hurlbert</u>, 439 F.3d at 1298).

Here, based upon the undisputed facts, Pilgrim's Pride is entitled to the entry of summary judgment on Mitchell's claim that Pilgrim's Pride retaliated against him for exercising his FMLA rights. It is undisputed that Mitchell requested and Pilgrim's Pride granted him FMLA leave to address his hypertension. Not only did this occur after the filing of his Amended Complaint, and thus is not pled in his Amended Complaint, but the adverse employment actions alleged in his Amended Complaint all occurred <u>before</u> Mitchell requested this FMLA leave. <u>See</u> Amended Complaint at ¶ 11 (suspended and terminated for insubordination), ¶¶ 13-14 (demoted to more difficult position). Indeed, the

adverse employment actions Mitchell identifies in his Amended Complaint occurred in the fall of 2015. Lagos Declaration at 6, 76, 78. However, Mitchell applied for, obtained, and used FMLA leave between May 2016 and early 2018. Lagos Declaration at 8; Mitchell Deposition at 132; Mitchell Deposition Attach. at 15-16, 39-41, 43-45, 49-51, 55-56, 62-63, 70-72, 76-79, 82-84, 87, 89, 91, 96. It would "defy logic to find that adverse actions which took place several months before any protected activity could somehow be causally related to each other." Bailey v. Town of Lady Lake, Fla., No. 5:05-cv-464-Oc-10GRJ, 2007 WL 1655374, at *5 (M.D. Fla. June 7, 2007) (emphasis in original). See also e.g., Gooden v. Internal Revenue Service, 679 Fed. Appx. 958, 968 (11th Cir. 2017) (no retaliation where alleged adverse employment action occurred before plaintiff engaged in protected activity); Howell v. Bluefield Reg'l Med. Ctr., Inc., No. 1:07-0112, 2008 WL 2543448, at *3 (S.D. W.V. June 23, 2008) (no causal connection where employer made termination decision prior to employee exercising statutorily protected rights); Cormack v. N. Broward Hosp. Dist., No. 08-61367-CIV, 2009 WL 2731274, at *5 (S.D. Fla. Aug. 26, 2009) ("Acts which precede protected activity cannot logically form the basis of causation of an adverse action."); Moore v. Hillsborough County Bd. of County Com'rs, 544 F. Supp. 2d 1291, 1306-07 (M.D. Fla. 2008) (no retaliation where employer made termination decision prior to employee filing EEO complaint); Smith v. Quintiles Transnational Corp., 509 F. Supp. 2d 1193, 1204 (M.D. Fla. 2007) (no causal connection where employer's decision to discipline employee occurred prior to employee's protected activity). Accordingly, viewing the evidence and drawing all inferences in Mitchell's favor, Haves, 52 F.3d at 921, on the record before the Court no genuine issue of material fact exists

regarding Mitchell's FMLA retaliation claim. Therefore, summary judgment is due to be entered in Pilgrim's Pride's favor on this claim in Count II.

## C. Disability Discrimination (Count III)

In his disability discrimination claim, Mitchell alleges that he

has been the victim of discrimination on the basis of his disability or perceived disability. During the course of [his] employment with [Pilgrim's Pride], he was treated differently than similarly situated non-disabled/perceived-as-disabled employees.

[Pilgrim's Pride] is liable for the differential treatment and actions against [Mitchell] after he took time off for his surgery, worked in a light duty capacity and attempted to return to work in his live hanging position, which treatment adversely affected the terms and conditions of [his] employment with [Pilgrim's Pride.]

Amended Complaint at ¶¶ 35-36. Additionally, Mitchell alleges that

from the date of his injury until September 1, 2015, he was disabled in that he was substantially limited in his ability to work without pain and in his ability to lift. [He] also needed accommodations in the form of time off of work for his surgery and light duty for a period of around six months.

Id. at ¶ 9. Mitchell asserts that when he attempted to return to live hanging, his supervisors "perceived [him] as being disabled in that [Pilgrim's Pride] refused to permit [him] to return to his position even after he had been released to full duty," and that he was falsely terminated for insubordination. Id. at ¶ 10-11. Then, after being reinstated at Pilgrim's Pride, Mitchell alleges that the new position to which he was assigned

[r]equire[d] him to use his shoulder in a way that causes him pain. . . . The job that [he] now holds, the MSC position, is more physically taxing and he has to have help at times lifting 50 lb boxes. It is more difficult and painful for [him] in this position than his previous position in live hanging.

Id. at ¶¶ 13-14.[16]

Mitchell's disability claim encompasses two separate theories of alleged unlawful discrimination: (1) he asserts that the company treated him differently because it perceived him as disabled, and (2) the company failed to accommodate his disabilities. See Schwarz v. City of Treasure Island, 544 F.3d 1201, 1209 (11th Cir. 2008) (noting three distinct theories of disability discrimination: disparate treatment, disparate impact, and failure to reasonably accommodate). Mitchell's disparate treatment claim appears to rest on his belief that upon his doctor lifting all restrictions on his left shoulder, he was entitled to return to work in the Live Shed, and that Pilgrim's Pride was wrong to bar him from doing so based on its perception of his medical condition. According to Mitchell, when he attempted to return to live hanging, Pilgrim's Pride unlawfully terminated him for insubordination, while at the same time, other employees, who had also suffered workplace injuries, returned to, or continued in their positions without any adverse consequences. See Amended Complaint at ¶ 10, 35-36. Mitchell also contends that Pilgrim's Pride refused to accommodate his disabilities when upon reinstatement, it placed him in the MSC Department, where the required work exacerbated his shoulder injury. Id. at ¶ 13-14, 36.

In many respects, the analysis for Mitchell's disability disparate treatment claim mirrors that for his race discrimination claim. "The ADA prohibits discrimination by an employer 'against a qualified individual on the basis of disability in regard to . . . discharge of employees' and any of the 'terms, conditions and privileges of employment.'" Jordan v.

---

[16] Since filing his Amended Complaint, Mitchell's job duties have changed at least twice. See Glover Deposition at 12; Lagos Declaration at 7, 8, 98, 113-127; Mitchell Affidavit at ¶ 25; Mitchell Deposition at 15, 122, 131; Mitchell Deposition, Medical Records at 67.

City of Union City, Ga., 646 Fed. Appx. 736, 739 (11th Cir. 2016), aff'g, 94 F.Supp.3d 1328 (N.D. Ga. 2015) (citing 42 U.S.C. § 12112(a)).  "In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar [McDonnell Douglas] burden-shifting analysis employed in Title VII employment discrimination cases."  Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001) (citing Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1226 (11th Cir. 1999)).[17]  Under the McDonnell Douglas burden-shifting analysis, the plaintiff "initially does not need to present evidence from which the trier of fact could conclude that the adverse employment action taken against him was caused by improper discrimination.  Instead, he need only establish that  "(1) he was disabled; (2) he was a qualified individual; and (3) "an adverse employment action was taken against him."  Wright v. Southland Corp., 187 F.3d 1287, 1289 (11th Cir. 1999).  "Once the plaintiff has established these elements . . . unlawful discrimination is presumed," and "[t]he defendant-employer can rebut this presumption only by articulating a legitimate, nondiscriminatory reason (or reasons) for the adverse employment action."  Id. at 1291.  If the employer does not satisfy this burden of production, then the plaintiff is entitled to judgment as a matter of law.  Id.  "If, however, the employer carries its burden, . . . the case is placed back into the traditional framework" and "the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against him on the basis of a protected characteristic" and that the employer's proffered reasons are merely pretextual.  Id.

---

[17] Mitchell does not identify any direct evidence of disability discrimination.

Pilgrim's Pride argues that Mitchell is unable to establish a prima facie case of disability discrimination. Pilgrim's Pride does not contest whether Mitchell was disabled or regarded as disabled by the company, but argues that Mitchell cannot demonstrate that he was qualified to return to the live hanging position, and that he has failed to identify any similarly situated non-disabled employees who were treated more favorably than he was. Motion at 15, 16-17, 19. Pilgrim's Pride also argues it had a legitimate non-discriminatory reason for terminating Mitchell. Id. at 17-18.

In response, Mitchell contends that he was qualified to return to the live hang position because his doctor had lifted all restrictions on his left shoulder. Response at 10-11. He argues that Pilgrim's Pride perceived him as disabled and therefore did not allow him to return to the live hang position, and terminated him for attempting to do so. Id. He further asserts that when Pilgrim's Pride reinstated him, he was fully qualified to return to the live hang position, but the company placed him in a different job at a lower rate of pay where that new post also aggravated his shoulders. Id. He points to other job assignments his employer gave him which he attributes to Pilgrim's Pride's discrimination against him based on a perceived disability. As such, Mitchell argues that "those transfers and refusal [to return him to the live hang position], coupled with his termination and reduction in pay, constitute evidence of discrimination based on his disability, and accordingly, summary judgment should be denied." Id.

On review of the record the Court concludes that Mitchell is unable to demonstrate that genuine issues of material fact exist as to whether Pilgrim's Pride discriminated against him on the basis of a disability or perceived disability. Even if Mitchell were able to make out a prima facie case of disability discrimination, Wright, 187 F.3d at 1289, he

has not presented evidence to rebut as pretextual his employer's stated legitimate non-discriminatory business reasons for terminating him and reinstating him to positions other than live hanging.

First, as discussed above in the context of Mitchell's race discrimination claim, the record establishes that Pilgrim's Pride terminated Mitchell for failing to follow his supervisors' orders, rather than because his supervisors perceived him to be disabled. Likewise, the uncontested record demonstrates that another reason Johnson did not permit Mitchell to return to live hanging, when he unilaterally showed up there on September 1, 2015, was that the live hang area already had a full crew. Moreover, while Mitchell's doctor had lifted all his work restrictions on his left shoulder in late August of 2015, Mitchell still needed an MRI on his right shoulder, and the medical team at Pilgrim's Pride remained concerned that he could reinjure himself if he returned to live hanging.

Additionally, the record does not support an inference that Pilgrim's Pride treated other employees outside of Mitchell's protected class more favorably than it treated him. See Wolfe v. Postmaster General, 488 Fed. Appx. 465, 468 (11th Cir. 2012). Mitchell does identify four employees who he perceives as receiving more favorable treatment from Pilgrim's Pride. As to these four potential comparators, Mitchell suggests that they, like him, were disabled in some manner, in that they suffered an injury or were in pain at work, but were permitted by Pilgrim's Pride to continue in their positions and were not terminated. However, in identifying these individuals, Mitchell has not identified a "similarly situated employee outside of his protected class," who was treated more favorably than he. Wolf, 488 Fed. Appx. at 468 (emphasis added). Moreover, what distinguishes Mitchell from these individuals is not that he was allegedly disabled or

perceived as disabled and they were not, but that he was terminated for insubordination and they were not. None of Mitchell's alleged comparators support an inference that Pilgrim's Pride treated him differently because of a perceived disability. Mitchell may believe that Pilgrim's Pride terminated him unfairly or that he should have been able to continue live hanging despite ongoing pain and further potential injury to his shoulder. However, Mitchell has not demonstrated that a genuine issue of material fact exists as to whether Pilgrim's Pride terminated him under the guise of a claim of insubordination when the company's true motivation was disability discrimination.

The Court also concludes that the record on summary judgment fails to demonstrate the existence of a genuine issue of material fact regarding whether Pilgrim's Pride failed to provide Mitchell reasonable accommodations for his disabilities. In this regard, Pilgrim's Pride argues that upon Mitchell's reinstatement, he returned to work with no medical restrictions and the company assigned him to work in the MSC Department. Motion at 18. When Mitchell later complained that the work caused him pain, Pilgrim's Pride transferred him to a position that did not require lifting. Id. As such, Pilgrim's Pride argues that "the Company has accommodated [Mitchell's] alleged disability at all times by transferring him to positions that do not interfere with his medical restrictions." Id.

In the Response, Mitchell argues that despite the fact that he provided his employer

> with numerous medical restrictions related to his ongoing shoulder conditions . . . [he] was placed in positions that routinely contradicted those restrictions. While in his sling immediately following his surgery, . . . Johnson had [Mitchell] work with the vats, which contradicted his restrictions. After his reinstatement instead of returning [him] to live hang, which would not aggravate his shoulders, [Pilgrim's Pride] placed [Mitchell] into the MSC, and the repetitive lifting of fifty pounds [sic] boxes, as opposed to six pound chickens, greatly aggravated his injury. He was also placed in

his current position in the neck chiller . . . which also involves heavy lifting. [Pilgrim's Pride] has not worked with Plaintiff to find a position that actually suits his medical needs. . . . .

Ultimately, not only did [Pilgrim's Pride] fail to accommodate [Mitchell] with an appropriate light duty assignment during the periods in which he was under medical restrictions, [Pilgrim's Pride] essentially ignored [Mitchell's] need for any accommodation, failing to even have an informal conversation with [Mitchell] about his abilities, medical restrictions, and what his daily work actually entailed.

Response at 11-12, 13.  Given his allegations that Pilgrim's Pride failed to provide him with accommodations, or even engage in an informal process with him to identify such accommodations, Mitchell argues summary judgment should be denied to Pilgrim's Pride. Id. at 13.  Mitchell's argument is unavailing.

First, in his Response, Mitchell raises new arguments that Pilgrim's Pride failed to provide him with reasonable accommodations immediately following his surgery in 2015, and also failed to do so when it transferred him to the Neck Chiller Department in 2018. The Court views these arguments as Mitchell's attempt to further amend the allegations of his Amended Complaint.  As discussed earlier, this is not permitted.  See Flintlock Constr. Servs., LLC, 710 F.3d at 1228.  As such, the Court will limit its analysis to Mitchell's allegations regarding his employer's failure to accommodate him in the MSC position after his reinstatement to Pilgrim's Pride in October of 2015.

Even construing the record before the Court in Mitchell's favor, Haves, 52 F.3d at 921, the evidence does not demonstrate that genuine issues of material fact exist regarding whether Pilgrim's Pride failed to accommodate Mitchell's disabilities.  Indeed, it is difficult to square Mitchell's arguments with the relevant law and facts before the Court.

> An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability — unless doing so would impose undue hardship on the employer. An accommodation is reasonable only if it would allow the employee to perform the essential functions of the job. But the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.

McCarroll v. Somerby of Mobile, LLC, 595 Fed. Appx. 897, 899 (11th Cir. 2014) (internal citations and quotations omitted). See also Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) (plaintiff must specifically demand an accommodation in order to trigger employer's accommodation duties under the ADA). As discussed earlier, when Pilgrim's Pride reinstated Mitchell in October of 2015, he was not under any medical work restrictions. Mitchell Affidavit at ¶ 22; Mitchell Deposition, Medical Records at 54, 60. Pilgrim's Pride assigned him to work in MSC, where his work included grinding chicken bones, and making and stacking boxes, which according to Mitchell, sometimes required him to lift fifty pound boxes. Amended Complaint at ¶ 14; Mitchell Deposition at 78-80. Notably, Mitchell testified that he believed his supervisors assigned him to MSC because "they thought it was easy work back there. [That it] would have been better on [his] shoulder." Mitchell Deposition at 121. Nonetheless, in December of that same year, Mitchell complained to the company nurse that he was suffering from pain in his left shoulder, and he sought medical attention. Lagos Declaration at 6-7; Papoi Deposition at 42; Mitchell Deposition, Medical Records at 60. His doctor released him back to work without any restrictions. Lagos Declaration at 7; Mitchell Deposition, Medical Records at 60. Six months later, Mitchell again sought medical care, complaining of increasing shoulder pain. Lagos Declaration at 7; Mitchell Affidavit at ¶ 23. Mitchell also mentioned to his supervisor that his work was causing him

pain, and his supervisor advised him to find a co-worker to trade off tasks with him, so that Mitchell could avoid pain. Mitchell Affidavit at ¶ 24; Mitchell Deposition at 128. However, Mitchell did not follow his supervisor's directions, testifying he was afraid his co-workers would complain about him. Mitchell Affidavit at ¶ 24. Nor did Mitchell make any specific complaints to Human Resources about his pain or work assignment. Mitchell Deposition at 128.

Mitchell nonetheless continued to seek medical care for his shoulder pain, and after a June 21, 2016 medical appointment, his doctor "issued restrictions of no overhead lifting and no lifting of more than ten pounds for four weeks." Lagos Declaration at 7, 8. At that point, Pilgrim's Pride promptly transferred Mitchell to the Salvage Department, where he remained until May of 2018. Lagos Declaration at 7, 8, 98; Glover Deposition at 29; Mitchell Affidavit at ¶ 25; Mitchell Deposition at 15, 122, 131; Mitchell Deposition, Medical Records at 67. While Mitchell sought additional medical attention for his shoulder during this time, his doctor did not issue any work restrictions, nor did Mitchell seek out any additional accommodations from the company.

Accordingly, the record belies Mitchell's suggestion that Pilgrim's Pride failed to provide him with accommodations and refused to even informally engage with him to respond to his reports of suffering from pain at work. To the contrary, the undisputed record reflects only that Mitchell received treatment from the company nurse, was transferred to different positions in compliance with his doctor's work restriction orders, and received direction from a supervisor as to how to avoid pain inducing tasks at work. Additionally, the record shows that Pilgrim's Pride's medical team conducted an

ergonomic assessment, as well as engaged in conversations and assessments with Mitchell's supervisors, regarding an appropriate work assignment for him.

Even if Mitchell never formally asked Pilgrim's Pride for an accommodation, which he says he did not, Pilgrim's Pride nonetheless was consistently responsive to Mitchell's statements regarding his shoulder pain and his doctor's work restrictions regarding the same. While Mitchell may have desired to return to live hanging, and while his shoulders may continue to bother him, the record before the Court does not demonstrate genuine issues of material fact regarding whether Pilgrim's Pride failed to accommodate Mitchell's alleged disabilities. Therefore, summary judgment is due to be entered in favor of Pilgrim's Pride as to Count III.

In conclusion, upon reviewing all the evidence and making all reasonable inferences in Mitchell's favor, Haves, 52 F.3d 921, the Court concludes that no genuine issues of material fact exist in regard to his claims of race discrimination (Count I), FMLA leave violations (Count II), and disability discrimination (Count III). Accordingly, judgment as a matter of law is due to be entered in favor of Pilgrim's Pride's as to all of Mitchell's claims.

In light of the foregoing, it is **ORDERED**:

1. Defendant's Motion for Summary Judgment (Doc. 45) is **GRANTED**.

2. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Pilgrim's Pride and against Johnny Mack Mitchell.

3.  The Clerk of the Clerk is further directed to terminate all pending motions and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 16th day of July, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc26

Copies to:

Counsel of Record